Filed 5/3/16  In re H.H. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re H.H., a Person Coming Under the Juvenile Court Law. | B265783 |
| | (Los Angeles County Super. Ct. No. DK06542) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>E.F.,<br><br>        Defendant and Appellant. | |

        APPEAL from orders of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Affirmed.

        M. Elizabeth Handy, under appointment by the Court of Appeal, for Defendant and Appellant.

        Mary C. Wickham, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Elizabeth F. (mother) appeals from jurisdictional and dispositional orders in the juvenile court relating to her daughter, H.H. The court found jurisdiction on the basis that mother had mental or emotional issues that endangered H.H.'s physical health and safety. (Welf. & Inst. Code, § 300, subd. (b).[1]) In its dispositional order, the court ordered mother to undergo a psychological evaluation. Mother challenges these findings on appeal.

We hold that substantial evidence supported the juvenile court's jurisdictional and dispositional findings. Mother's angry outbursts, inconsistent statements about the child, failure to provide sufficient medical care for the child, and heavy reliance on others to care for the child indicated that mother's psychological issues placed H.H. at risk for physical harm or illness. In light of those jurisdictional findings, the court's order for a psychological evaluation in the disposition report also was supported by substantial evidence.

## FACTUAL AND PROCEDURAL BACKGROUND

H.H. was born in March 2014. She first came to the attention of DCFS in July 2014 after being taken by ambulance to the hospital, and hospital staff called the Child Protection Hotline. Mother, then age 20, reported that while she and father were fighting, father "[g]ot frustrated and he grabbed the baby's head and squeezed it hard." Mother did not seek medical attention for H.H., but neighbors who heard the couple fighting loudly called law enforcement. Mother reported to sheriff's deputies that father had placed his hands on either side of H.H.'s head and shook her from side to side. Concerned about a risk of injury to H.H., deputies summoned paramedics.

Father's parents (paternal grandparents) came to the family's apartment after they "received a frantic call" from mother saying that father had punched mother in the face and had thrown something at her. As they arrived, paramedics were taking H.H. to the

---

[1] All further statutory references are to the Welfare & Institutions Code unless otherwise indicated.

hospital. Paternal grandmother told a social worker that mother refused to ride in the ambulance with H.H. While H.H. was in the hospital, "mother left the hospital in a hurry . . . stating that the paternal grandparents were going to provide care for [H.H.] for a week because she ([t]he mother) has not had much sleep."

Paternal grandmother reported to the social worker that mother and father "fight all the time" in the presence of the child. Paternal grandmother said that mother "is always calling her in the middle of the night to come pick up the baby, because she and her son . . . are arguing."

The following day, H.H. was doing well in the hospital. She had no visible marks or bruises, and all test results were negative. DCFS contacted sheriff's detectives, and found that father had turned himself in. Father told the detectives that he did not squeeze H.H.'s head, he did not hit mother, and he did not throw anything at mother. A sheriff's detective also told DCFS that mother "is also starting to recant her story as well."

A sheriff's report described an interview with mother the day after the incident. Mother said father was "tapping his hands on the baby's face," and that he put his hands on H.H.'s face and "scrunched" her cheeks. As mother described the argument, she said that father tossed a butane can at her head. The report stated, "[Mother] began to laugh as she told me this story. She added it was not funny but the part about getting hit in the head with a canister was funny to her. I told [mother] that was not the same version of events she told the deputies last night. [Mother] said last night when all the deputies and fire personnel were at her house, she felt like she was under a lot of pressure. She said she told the deputies what she believed they wanted to hear." When the deputy asked mother why she was not at the hospital with the baby, mother "told me she was tired and was told by staff [H.H.] was doing fine."

Father denied mother's allegations as "all lies," and said that when mother gets emotional she "says whatever comes to her mind." Father was not criminally prosecuted for any actions relating to the incident.

DCFS filed a section 300 petition alleging physical abuse of H.H. by father (§ 300, subd. (a), count a-1), violent altercations between mother and father (§ 300, subd. (a),

3

count a-2), failure to protect from harm relating to father's physical abuse (§ 300, subd. (b), count b-1), failure to protect from harm relating to violent altercations between mother and father (§ 300, subd. (b), count b-2), and failure to protect from harm relating to father's use of medical marijuana (§ 300, subd. (b), count b-3).

At a hearing on September 18, 2014, the juvenile court found that H.H. was a person described by section 300, subdivision (b), and sustained count b-3. H.H. was to remain in mother's care and father was to have monitored visits. The court ordered family maintenance services. The case was set for a status review on March 18, 2015.

A status review report in March 2015 stated that mother had completed an eight-week parenting course and had attended 12 individual therapy sessions. Mother also enrolled in a 20-week interactive baby-and-me program. The social worker noted that mother needed reminders about maintaining scheduled medical appointments for H.H., and that she had not taken H.H. to the doctor even though H.H. had been sick for a month. The social worker also noted that mother's friend had been helping take care of H.H., and that mother relied heavily on the friend to assist with H.H.'s care. The report stated, "It is clear that mother does not seem to grasp the parental concept at this time."

A DCFS report dated April 29, 2015 described a social worker visit to mother and H.H., but it does not note the date of the visit.[2] The social worker approached the apartment building and attempted to get into the locked gate for about 10 minutes, and heard a child crying from inside mother's apartment. A neighbor eventually let the social worker in the gate, and when mother answered the door, it appeared she had just woken up. The social worker noted that H.H. had been crying and had tears in her eyes, but mother insisted that they both had just woken up. The report stated, "The child appeared to be sickly and unclean." She had a dark, dirty substance around her ankles and feet. "The child's neck and chest appeared to be covered in a sticky substance with black pen size dirt balls along her neck and chest area. The child was wearing a heavily soiled diaper and no clothing." Mother reported that H.H. was dirty because she had been

---

[2] At the hearing on June 15, 2015, the DCFS attorney stated that this visit occurred on February 25, 2015.

4

playing with her food that morning. Mother reported that H.H. was sick and that she had taken her to the doctor and scheduled a follow-up visit. But when asked for specifics, mother changed her story about the follow-up visit, saying she had not been able to reach the doctor's office. Mother could not remember when H.H. last had a physical exam.

Mother reported that H.H. spends the night with father most weekends. When the social worker questioned whether that arrangement had been approved by DCFS, mother changed her story to say that H.H. spent the night with father once or twice.

The same DCFS report noted that the social workers assigned to the case had received an email from paternal grandfather, who is a registered nurse. Paternal grandfather stated, "I am very concerned about [H.H.] as [mother] has indicated severe depression and suicidal thoughts on Wednesday 3/25/15. . . ." In a text message, mother had written, "I can't handle this depression anymore and this abuse. It's making me literally suicidal . . ." On March 28 (three days later), mother wrote in another text message, "I have been having extreme depression the past week feeling suicidal so [paternal grandmother] was watching [H.H.]- I'm signing up to see a psychologist soon."

In a visit with a social worker on April 1, 2015, mother admitted to feeling depressed, but she said that the family had misinterpreted her communications. Mother said she was "done with" father, but she also said that they were trying to work things out. Mother also reported to DCFS that "father had choked her a couple of weeks ago and she passed out yet she and the baby spent the nigh[t] with him." She said that when father choked her she called police, but they refused to take a report. She also said that father held her and H.H. overnight against her will. Father denied these accusations.

At the April 1 visit, mother also reported that H.H. had been sick with a cold for over a month. On April 5, paternal grandmother took H.H. to the hospital for a high fever; she was diagnosed with an ear infection and diaper rash.

On April 23, a Team Decision Making meeting was held with mother, maternal grandmother, paternal grandmother, a social worker, and other DCFS representatives to "address[ ] concerns of general neglect and the ongoing domestic violence with mother and father." The report from the meeting stated, "Mother and maternal grandparents

agreed that at times mother is overwhelmed." At the meeting, "it was discovered that mother doesn't care for the child on a fulltime basis as paternal grandparents have shared the responsibility in caring for the child [H.H.]. Paternal grandparents have reported [mother] has sent text messages stating 'come get her I can't stop the stupid ass crying.'" On two different occasions when paternal grandparents picked up H.H., she had a fever. In addition, H.H. "spends days and weeks with paternal grandparents." Mother also "continues to need reminders to take the child to the doctor and perform basic care for the minor." Mother and maternal grandparents agreed that mother was overwhelmed and needed help from the grandparents.

DCFS informed mother "that due to the many concerns the department would be seeking a warrant to remove the child from her care." As the team discussed the benefits of having two sets of grandparents available for H.H.'s placement, mother interjected that she would rather see her daughter placed in foster care.

On April 26, a social worker went to mother's apartment to detain H.H. The report noted that mother showed no emotion and simply said, "o.k." In a video sent to the social worker (presumably from mother), mother told H.H. that she would be better off living with her grandparents.

On April 29, 2015, DCFS filed a petition under section 342. The petition alleged that H.H. was at risk of serious harm due to the violent altercations between mother and father, including the incident in which father choked mother to unconsciousness (§300, subd. (a), count a-1); mother had "mental and emotional problems, including [d]epression and suicidal ideation, which render the mother incapable of providing regular care of the child" (§ 300, subd. (b), count b-1); and that mother and father failed to protect H.H. in light of their physical altercations (§ 300, subd. (b), count b-2).

The juvenile court found a prima facie case for detaining H.H. based on section 300, subdivisions (a) and (b). The court ordered H.H. detained and placed her with maternal grandparents.

In a jurisdiction/disposition report dated June 15, mother responded to the allegations in the section 342 petition. Regarding the allegation that she was suffering

6

from depression and suicidal ideation (b-1), mother explained that she had been stressed and was having problems with father. She admitted that she texted paternal grandfather that she was depressed and suicidal, but "I shouldn't have said that." Mother pointed out that she had no history of cutting or suicide attempts. Regarding the allegations about the choking incident (a-1 and b-2), mother confirmed that the incident happened, and that father threatened to kill her if she reported it to police. But this time she said that H.H. was not present at the time, and that father only held mother against her will.

DCFS also interviewed H.H.'s grandparents. Paternal grandmother said that mother and father are not ready to care for a baby, and that visits with both parents should be monitored. Maternal grandmother stated that she did not believe that mother had emotional issues or that she was suicidal, but that mother was immature and would "cry wolf." She thought that mother did not understand the impact of the word "suicidal" and what that would mean to paternal grandfather, a registered nurse. Maternal grandmother also recommended that visits with both parents should be monitored. Maternal grandfather also thought that mother was probably not suicidal, but instead was being "dramatic." He stated that he thought mother was immature and had a learning disability. Paternal grandfather reported that not only did mother text him about feeling suicidal, she also told him in person approximately four days later that she was feeling suicidal.

A therapist that mother met with three times told the social worker that mother was not emotionally unstable, she did not demonstrate suicidal ideation, and she had post-traumatic stress as a result of the domestic violence with father. An unsigned letter attached to the report from the same therapist said mother was being treated for post-traumatic stress disorder, and noted that mother said that her relationship with father was over.

A family preservation assistant working with mother noted that mother "appears to need guidance to keep appointments and requires follow up that she did indeed keep these appointments." She also stated that mother minimized the domestic violence with father, and "it appeared that mother did not understand why the baby was removed from her care." The family preservation assistant also thought mother would benefit from

7

therapy outside the home and away from H.H., where she could discuss deeper issues uninterrupted. She reported that "she has not observed any behaviors that are indicative of mother needing psychotropic medication or more mental health services than she already receives."

The report stated that mother wanted H.H. to be placed back in her care. Mother said she was complying with court-ordered requirements: "They are throwing things at me and I am doing it. I didn't do anything wrong." H.H. appeared well-bonded to mother during her supervised visits.

A social worker reported that mother "does not appear to have an understanding that she needs to learn from her classes nor does she appear to have a comprehension of what brought her to the attention of DCFS." The DCFS report stated that mother's lack of insight "poses a safety risk as mother continues to make poor choices despite receiving services and given minor [H.H.'s] young age and vulnerability." DCFS recommended further parenting education, a mental health evaluation, domestic violence counseling, and individual counseling.

At a hearing on June 15, the juvenile court sustained all allegations in the section 342 petition. The court modified the case plan to include a domestic violence program and a "psychological/mental assessment including a psychiatric evaluation to rule out depression." H.H. was to remain with her maternal grandparents.

Mother timely appealed.

## DISCUSSION

In her appeal, mother seeks reversal of the court's jurisdictional and dispositional findings. She argues there was no substantial evidence to support the juvenile court's order finding jurisdiction under section 300, subdivision (b), that mother "has mental and emotional problems including Depression and suicidal ideation, which render the mother incapable of providing regular care of the child." She also argues that there was no evidence to support the court's order that mother undergo a psychological assessment.

8

**A.      The issues relating to mother's mental health may affect future proceedings**

Mother's appeal may be considered moot on two different bases. First, the appeal from the jurisdictional finding may be considered moot. DCFS alleged in its section 342 petition that mother had mental and emotional problems that rendered her incapable of caring for H.H. The juvenile court found the allegations true. Mother challenges "whether there was any substantial evidence to support the court's true findings on the mental health allegations when she had no history of mental health issues and/or the need for hospitalization or medication." However, the juvenile court also found several additional bases for jurisdiction under the original section 300 petition, and two additional bases for jurisdiction under the later section 342 petition. Mother has not challenged any of these alternative bases for jurisdiction. "As a general rule, a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction and render moot a challenge to the other findings. [Citation.]" (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452 (*In re M.W.*).)

Second, mother's appeal of the dispositional findings may be considered moot. After briefing in this case was complete, DCFS filed a request for judicial notice and a motion to partially dismiss the appeal, alerting us to the fact that H.H. had been placed back into mother's care while this appeal was pending. DCFS argued that because the disposition order had been terminated and H.H. was back in mother's care, "a reversal of the juvenile court's order removing H.H. from mother's custody would be an idle act." DCFS noted that mother's challenges to the juvenile court's "jurisdictional findings pertaining to her mental health and [the] dispositional order requiring her to undergo a psychiatric evaluation" were not mooted by the change in disposition. Mother did not respond to the motion or request. "An appeal becomes moot when . . . the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief." (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054 (*Esperanza C.*).)

We denied DCFS's motions and consider the merits of mother's challenge to the juvenile court's finding that mother's mental health issues presented a risk of physical

9

harm or illness to H.H. "On a case-by-case basis, the reviewing court decides whether subsequent events in a dependency case have rendered the appeal moot and whether its decision would affect the outcome of the case in a subsequent proceeding." (*Esperanza C.*, *supra*, 165 Cal.App.4th at p. 1055.) Therefore, even where a finding otherwise may be considered moot, we "retain discretion to consider the merits of a parent's appeal (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1493), and often do so when the finding '(1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) "could have other consequences for [the appellant], beyond jurisdiction" [Citation].' [Citations.]" (*In re M.W.*, *supra*, 238 Cal.App.4th at p. 1452.)

Here, the court's findings relating to mother's mental health are likely to impact future issues in this case. Of the three bases for jurisdiction sustained by the court, two of them were related to mother's violent relationship with father. Mother has indicated that her relationship with father is either over or likely to end. If that relationship ends and the bases for jurisdiction relating to father are no longer at issue, the question of whether mother is capable of caring for H.H. will become paramount. Moreover, the court ordered that mother submit to a psychological evaluation as part of the case plan. In her appeal, mother challenges the court's authority to order a psychological evaluation, and she has not provided us with any indication that this issue has become moot. We therefore exercise our discretion to consider the court's findings as to mother's mental and emotional health, because those issues may impact current or future dependency proceedings and could have other consequences for mother and H.H.

**B.      Substantial evidence supports the court's jurisdictional and dispositional findings**

Jurisdiction under section 300, subdivision (b) is warranted when the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or

10

substance abuse." (§ 300, subd. (b).) A jurisdictional finding under section 300, subdivision (b) requires: "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M*. (1991) 1 Cal.App.4th 814, 820.) The third element "effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur). [Citations.]" (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1396.)

"We affirm a juvenile court's jurisdictional and dispositional findings if they are supported by substantial evidence. [Citation.] 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.]" (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103.)

Mother argues there was insufficient evidence to support the juvenile court's findings on the mental health allegation. "In a challenge to the sufficiency of the evidence to support a jurisdictional finding, the issue is whether there is evidence, contradicted or uncontradicted, to support the finding. In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences. . . . Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)

Here, substantial evidence supports the court's orders. DCFS was alerted to issues involving H.H. when mother reported that father squeezed the baby's head. Mother later recanted the allegations involving H.H., and laughed when describing her violent altercation with father to sheriff's deputies. Mother would not accompany H.H. to the hospital in the ambulance, and left H.H. in the hospital after she was admitted. Once H.H. was back home with mother, mother gave misleading and inconsistent information

11

to social workers about H.H.'s health care and whether mother was maintaining a relationship with father. At a February 2015 meeting with a social worker, mother said H.H. had been sick for a month, and mother lied about making a follow-up medical appointment. In March 2015, mother again said that H.H. had been sick for a month, but mother had not taken her to a doctor. Shortly thereafter, paternal grandparents took H.H. to the hospital for an ear infection and diaper rash.

In addition, mother asked the paternal grandparents to pick up the baby because "I can't stop the stupid ass crying." Twice when the paternal grandparents picked up H.H., she had a fever. One month before DCFS filed the section 342 petition, mother told paternal grandfather by text message and in person that she was depressed and "literally suicidal." Although mother had taken multiple parenting classes, she relied heavily on others to care for H.H., including leaving H.H. with paternal grandparents for days or weeks at a time. When the social worker stopped by for an unannounced visit, H.H. was crying and covered in "dirt balls" while mother slept. After DCFS detained the baby and placed her with maternal grandparents, mother could not recognize that she had done anything to endanger H.H., instead insisting that she did nothing wrong.

Even after mother had attended multiple counseling sessions, completed parenting classes, and worked with an in-home DCFS family preservation assistant, mother continued to make poor choices and lack parental insight. Her failure to take responsibility for H.H.'s medical needs, including not knowing when H.H. last visited the doctor, failing to obtain medical care for H.H. while she was sick, and failing to schedule follow-up medical care, indicates that H.H.'s health was at risk while she was in mother's care. There was ample evidence that mother's mental health issues may have had a negative effect on her ability to care for H.H., and were relevant to whether mother was mentally and emotionally able to adequately provide for H.H.'s needs.

Mother argues that because she was young, she "was in need of a lot of help to support her in learning how to effectively parent." Even after support was provided, however—including help from mother's friend and both sets of grandparents, parenting classes, and visits with an in-home family preservation assistant—mother still had trouble

12

meeting H.H.'s basic needs. One month before the section 342 petition was filed, mother told paternal grandfather that she was suicidal. At the DCFS meeting just days before H.H. was removed from mother's care, DCFS learned that mother left H.H. with paternal grandparents for days and weeks at a time, and that mother continued to be "overwhelmed." The evidence does not support mother's argument that she was simply in need of training; substantial evidence demonstrated that mother was having trouble meeting H.H.'s basic needs.

Mother also argues that the mental health allegation should not have been sustained because "[t]here were no reports of [mother] being hospitalized in the past, no diagnosis of mental or emotional illness, and nothing to indicate that she had ever been prescribed any medication to treat a mental health condition." This argument is not supported by the evidence, as mother's therapist said mother was experiencing post-traumatic stress disorder following the violent altercations between mother and father. Moreover, mother cites no authority for the proposition that jurisdiction under section 300, subdivision (b) is improper without an established psychological diagnosis or a past history of hospitalization.

Mother also challenges the court's requirement in the dispositional order that she undergo a "psychological/mental assessment including a psychiatric evaluation to rule out depression." Mother argues that the assessment was not warranted because the underlying rationale for the order lacked substantial evidence. We have found, however, that substantial evidence supported the court's finding that mother's mental and emotional issues interfered with her ability to care for H.H. In dependency cases, "the record must show [that DCFS] identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the duration of the service plan, and made reasonable efforts to assist the parents when compliance is difficult." (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420.) To this end, "psychological evaluations of parents are frequently used in dependency cases" to help the court determine what services might be helpful. (*Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 199.)

13

Here, after sustaining the jurisdictional allegations, the court ordered an evaluation to determine what services would best serve the needs of mother and H.H. There was substantial evidence that mother's psychological or emotional issues were interfering with her ability to care for H.H., and the court's order for an evaluation of mother was reasonable. The juvenile court's dispositional order was supported by substantial evidence.

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


EPSTEIN, P. J.


WILLHITE, J.